# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW ARLINGTON RING, <br><br> Plaintiff, <br><br> v. <br><br> CLIFF ALLENBY, et al., <br><br> Defendant(s). | Case No.: 1:18-cv-001283-JLT (PC) <br><br> FIRST SCREENING ORDER <br><br> (Doc. 1) <br><br> 21-DAY DEADLINE |

Plaintiff claims the care and treatment he received for his eyes, resulted in his permanent blindness. However, for the reasons discussed below, Plaintiff has not stated any cognizable claims. Because Plaintiff may be able to correct the deficiencies in his pleadings, he is given opportunity to file a first amended complaint and the standards under which it will be considered.

A. **Screening Requirement and Standard**

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). A complaint, or portion thereof, should only be dismissed for failure to state a claim upon which relief may be granted if it appears beyond doubt that Plaintiff can prove no set of facts in support of the claim or claims that would entitle him to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *see also Palmer v. Roosevelt Lake Log*

*Owners Ass'n*, 651 F.2d 1289, 1294 (9th Cir. 1981). A complaint may be dismissed because it lacks a cognizable legal theory or fails to allege sufficient facts under a cognizable legal theory. *See Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990).

**B.     Pleading Requirements**

    **1.     Federal Rule of Civil Procedure 8(a)**

"Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions," none of which applies to section 1983 actions. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002); Fed. R. Civ. Pro. 8(a). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. Pro. 8(a). "Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512.

Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 555. Factual allegations are accepted as true, but legal conclusions are not. *Iqbal.* at 678; *see also Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009); *Twombly*, 550 U.S. at 556-557.

While "plaintiffs [now] face a higher burden of pleadings facts . . . ," *Al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009), the pleadings of pro se prisoners are still construed liberally and are afforded the benefit of any doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). However, "the liberal pleading standard . . . applies only to a plaintiff's factual allegations," *Neitze v. Williams*, 490 U.S. 319, 330 n.9 (1989), "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled," *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997) quoting *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982), and courts are not required to indulge unwarranted inferences, *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted). The "sheer possibility that a defendant has acted unlawfully" is not sufficient,

and "facts that are 'merely consistent with' a defendant's liability" fall short of satisfying the plausibility standard. *Iqbal*, 556 U.S. at 678; *Moss*, 572 F.3d at 969.

If he chooses to file a first amended complaint, Plaintiff should endeavor to make it as concise as possible. He should merely state which of his constitutional rights he feels were violated by each Defendant and the factual basis. Plaintiff need not and should not cite legal authority for his claims in a second amended complaint. His factual allegations are accepted as true and need not be bolstered by legal authority at the pleading stage. If Plaintiff files a first amended complaint, his factual allegations will be screened under the legal standards and authorities stated in this order.

### 2. Linkage and Causation

Section 1983 provides a cause of action for the violation of Plaintiff's constitutional or other federal rights by persons acting under color of state law. *Nurre v. Whitehead*, 580 F.3d 1087, 1092 (9th Cir 2009); *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012) (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)) (internal quotation marks omitted). To state a claim, Plaintiff must allege facts demonstrating the existence of a link, or causal connection, between each defendant's actions or omissions and a violation of his federal rights. *Lemire v. California Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1074-75 (9th Cir. 2013); *Starr v. Baca*, 652 F.3d 1202, 1205-08 (9th Cir. 2011).

Plaintiff's allegations must demonstrate that each defendant personally participated in the deprivation of his rights. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). This requires the presentation of factual allegations sufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678-79; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). The mere possibility of misconduct falls short of meeting this plausibility standard. *Iqbal*, 556 U.S. at 678; *Moss*, 572 F.3d at 969. However, prisoners proceeding *pro se* in civil rights actions are still entitled to have their pleadings liberally construed and to have any doubt resolved in their favor. *Hebbe*, 627 F.3d

at 342.

Plaintiff names Cliff Allenby and Brandon Price as Defendants but fails to link either of them to any of his factual allegations. It appears Plaintiff named them merely because they hold supervisory positions. Under section 1983, liability may not be imposed on supervisory personnel for the actions of their employees under a theory of respondeat superior. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). "In a § 1983 suit or a Bivens action - where masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer." *Id*. Therefore, when a named defendant holds a supervisory position, the causal link between the defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979).

**C.     The Complaint**

Plaintiff is civilly detained at Coalinga State Hospital ("CSH") pursuant to California's Sexually Violent Predator Act contained within Welfare & Institution Code sections 6600 et seq. A Sexually Violent Predator ("SVP") is defined as an individual with "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." Welf. & Inst. Code § 6600(a).[1] The SVPA authorizes the involuntary civil commitment of a person who has completed a prison term, but has been given a "full evaluation" and found to be a sexually violent predator. *Reilly v. Superior Court*, 57 Cal.4th 641, 646 (2013); *People v. McKee*, 47 Cal.4th 1172, 1185 (2010).

Plaintiff names Cliff Allenby, Executive Director Brandon Price, Dr. Gary Powers, John Doe Social Worker, Jane Doe Litigation Coordinator, and Dr. Karim Rasheed as the defendants in this action. Plaintiff asserts two claims for which he seeks compensatory and punitive damages.

**DISCUSSION**

To determine whether conditions of confinement of civilly committed individuals have

---

[1] California voter-approved Proposition 83 validly extended the term of commitment under the SVPA to an indeterminate period, ensuring the SVP remains in custody until successfully proving he or she is "no longer an SVP or the Department of Mental Health determines he [or she] no longer meets the definition of an SVP." *Bourquez v. Superior Court*, 156 Cal.App.4th 1275, 1287 (2007); Welf. & Inst. Code §§ 6605, 6608(i).

4

been violated, courts look to the substantive due process clause of the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *Jones v. Blanas*, 393 F.3d 918, 931-32 (9th Cir. 2004). States are required to provide civil detainees "'more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).

Although civilly detained persons must be afforded more considerate treatment and conditions of confinement than criminals, where specific standards are lacking, courts may look to decisions defining the constitutional rights of prisoners, to establish a floor for the constitutional rights of persons detained under a civil commitment scheme. *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (citing *Hydrick v. Hunter*, 500 F.3d 978, 989 (9th Cir. 2007), *vacated and remanded on other grounds by* 556 U.S. 1256 (2009)). Eighth Amendment standards may be borrowed to establish the constitutional floor. *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998); *Redman v. County of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991), *abrogated on other grounds by* 511 U.S. 825 (1994).

**A.     Claim I -- Medical Care (Doc. 1, pp. 4-8)**

The only Defendants Plaintiff links to this claim are Dr. Powers and Dr. Rasheed. Plaintiff states that in late-2014 or early-2015, he began having problems with his eyesight. Plaintiff was seen by an optometrist to be checked for possible glaucoma. The optometrist told Plaintiff he would need treatment to correct the problem (presumably glaucoma, but "the problem" is not identified). Thereafter, Plaintiff explained this to the nursing staff and requested a follow-up appointment with his unit care provider -- Defendant Dr. Powers. But this follow-up appointment never occurred.

Plaintiff spoke to the optometrist's assistant who told Plaintiff the optometrist had ordered some medication for Plaintiff and that Plaintiff should follow-up with his unit nurse or unit doctor. Plaintiff saw the unit nurse who said Plaintiff would be put on sick call for a follow-up with the doctor. Plaintiff was not called to see the doctor the next day so he contacted the unit nurse (who was a different nurse than he previously spoke with). This nurse remembered that

Plaintiff had already seen the optometrist and indicated that Plaintiff's chart would be reviewed and if any medication had been ordered it would be taken care of. The nurse told him that this would be done without need for Plaintiff to see the doctor (Dr. Powers). This scenario repeated several times without Plaintiff ever obtaining the medication the optometrist ordered for him.

In January 2016, Plaintiff complained to a nursing coordinator who knew Plaintiff "and questioned him about him nearly falling." Plaintiff was then taken to see Dr. Powers and the nurse asked why Plaintiff hadn't been seen before. Dr. Powers claimed he know nothing of Plaintiff wanting to be seen or that any medication had been ordered. Plaintiff alleges this is a lie because every time a patient is seen in the clinic there is a full report and the unit provider (Dr. Powers) is notified about any recommendations for medications. Dr. Powers then referred Plaintiff to be seen by an eye specialist -- Dr. Karim Rasheed at the Sani Eye Center in Templeton, CA.

Plaintiff saw Dr. Rasheed in August of 2017. Dr. Rasheed recommended surgery on both of Plaintiff's eyes as "Plaintiff's right eye was at about 30% and his left eye was at about 60%." Dr. Rasheed indicated he could correct Plaintiff's left eye completely and get his right eye back to at least 60% and that Plaintiff's right eye should be done first since it was worse than the left. Post-surgery, Dr. Rasheed gave Plaintiff eye drops, directed that Plaintiff was not to take anything stronger than Tylenol for pain, and ordered Plaintiff back in about a month for surgery on his left eye. However, when Plaintiff arrived back to CSH, the R&R doctor said that Plaintiff wasn't to take any medication that wasn't prescribed by a doctor at CSH and that Plaintiff would be seen by Dr. Powers who would order what Plaintiff needed. Plaintiff ultimately received drops that were in a different bottle than the drops he received from Dr. Rasheed. Though Plaintiff questioned this to the medication room attendant, a nurse, and finally Dr. Powers, he was simply told that the medication was what he was ordered to receive and that the difference was probably due to it coming from a different distributor. Plaintiff also discovered that Dr. Powers ordered Plaintiff to receive 2400 mg of Motrin instead of simple Tylenol for his pain.

When he returned to see Dr. Rasheed, Plaintiff explained all of this to him. Dr. Rasheed stated that he guessed they thought they knew as much as he did, but there was a reason he gave

Plaintiff that medication. In any event, Dr. Rasheed stated that he didn't see any damage and asked Plaintiff if he felt tenderness or discomfort. Plaintiff indicated it was still tender and sore, to which Dr. Rasheed responded that it was to be expected since Plaintiff just had major surgery and went ahead with surgery on Plaintiff's left eye. Plaintiff did not think he should still be sore but agreed that it was a major surgery. During surgery on his left eye, Plaintiff felt a tug on his eye. Though Plaintiff alleges Dr. Rasheed knew that it was hurting, Dr. Rasheed proceeded with the surgery and ignored Plaintiff because he was too busy attempting to impress his nurse by explaining the surgery to her to the point that Plaintiff felt like Dr. Rasheed was bragging and not being as careful as he should have been.

Immediately after returning to DSH-C, Plaintiff felt something was wrong and requested a second opinion. Instead of getting a second opinion, Dr. Powers and/or CSH sent Plaintiff back to Dr. Rasheed who stated that he knew what he was doing and had done numerous similar procedures with very good success and that Plaintiff needed to remember that he was 79 years old and wouldn't heal as fast as he did when he was 20. Dr. Rasheed told Plaintiff to rest his eyes as much as possible and that he believed Plaintiff would see great improvement in his eyesight over time.

However, this was not the case. Plaintiff alleges that his eyes only got worse with time and that he saw the optometrist who told Plaintiff his eyesight had gotten worse, that Dr. Rasheed had pulled on the nerves and damaged them, that there was no way to repair the damage done, and that Plaintiff would probably be blind within the next 6 months. The doctor said he would see Plaintiff every couple of months to follow-up but there wasn't anything that could be done. The optometrist kept his word and saw Plaintiff every couple months and ordered new glasses as Plaintiff's eyesight worsened. In September of 2018, Plaintiff woke one morning to find everything was black, he had completely lost his eyesight.

### 1. Standards for Medical Care

Plaintiff's allegations in Claim I are entirely premised on the care and treatment he received for his eye condition. "Involuntarily committed patients in state mental health hospitals have a Fourteenth Amendment due process right to be provided safe conditions by the hospital

7

administrators. . . [W]hether a hospital administrator has violated a patient's constitutional rights is determined by whether the administrator's conduct diverges from that of a reasonable professional." *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016) (quoting *Ammons v. Wash. Dep't. of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir.2011)).

In other words, a decision, "if made by a professional,[2] is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*, (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). *See Parham v. J. R.*, 442 U.S. 584, 608, n. 16 (1979) (In limiting judicial review of medical decisions made by professionals, "it is incumbent on courts to design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems"); *see also Rhodes v. Chapman*, 452 U.S. 337, 352 (1981) ("[C]ourts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system ..."); *Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (In the context of conditions of confinement of pretrial detainees, "[c]ourts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility"); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (In considering a procedural due process claim in the context of prison, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application").

This standard has been referred to as the "*Youngberg* professional judgment standard." *Ammons*, 648 F.3d at 1027. "The *Youngberg* standard differs from the 'deliberate indifference'

---

[2] The *Youngberg* Court defined a "'professional' decision-maker," as "a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded." 457 U.S. at 323, n. 30.

standard used in Eighth Amendment cruel and unusual punishment cases, in that '[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Mitchell*, 818 F.3d at 443 (citing *Ammons*, 648 F.3d at 1027 (quoting *Youngberg*, 457 U.S. at 321-22) (internal quotation marks omitted)).). The professional judgment standard is an objective standard and it equates "to that required in ordinary tort cases for a finding of conscious indifference amounting to gross negligence." *Ammons v. Washington Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1029 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2379 (2012) (citations and internal quotation marks omitted). Thus, a civil detainee's claim that is cognizable under the *Youngberg* standard will also state a cognizable gross negligence claim under California law and vice versa, but mere difference of opinion with medical staff is not actionable. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

"Gross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages. [Citation omitted in *Chavez*.] However, to set forth a claim for 'gross negligence' the plaintiff must" also allege conduct by the defendant involving either a lack of minimal care or an "extreme departure" from the typical standard of care. *Chavez v. 24 Hour Fitness USA, Inc.*, 238 Cal. App. 4th 632, 640 (2015) (quoting *Rosencrans v. Dover Images, Ltd.*, 192 Cal.App.4th 1072 (2011); *City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 754 (2007) Gross negligence "'connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results....'" *Chavez*, at 640 (quoting *Eriksson v. Nunnink*, 191 Cal.App.4th 826, 857 (2011).

Plaintiff does not state a cognizable claim against Dr. Powers. First, Plaintiff does not explain the treatment that was recommended or ordered by the optometrist that Dr. Powers failed to provide and does not identify "the problem" which the optometrist told him would require treatment. Likewise, he fails to state facts to support that his complaints to the nursing staff about the failure to obtain this treatment should be deemed sufficient to impute liability on Dr. Powers. Plaintiff's claims that he was told to follow-up with his unit nurse or unit doctor, saw the unit nurse who told Plaintiff he'd be put on sick call for follow-up but did not provide the care does

not provide basis to find that Dr. Powers knew the optometrist had ordered treatment for Plaintiff's eyes that he did not receive. Plaintiff's allegations that every time a patient is seen in the clinic there is a full report and that Dr. Powers would have been notified about any recommendations for medications are mere conclusions which are insufficient for pleading purposes. *Iqbal*, 556 U.S. at 678. Further, when the issue was allegedly brought to Dr. Powers' attention in January of 2016, Dr. Powers referred Plaintiff to see Dr. Rasheed. This implies that had he known of the problem sooner, he would have acted sooner. Finally, Plaintiff's vague allegations related to Dr. Powers' involvement prior to seeing Dr. Rasheed fail to show any injury/damages caused by Dr. Powers' action/inaction. Similarly, Plaintiff fails to show injury/damages caused when, after Dr. Rasheed's first surgery, Dr. Powers ordered eye drops that were in a different bottle (which Plaintiff was told were probably just from a different distributor) and that Dr. Powers ordered Plaintiff 2400 mg of Motrin rather than simple Tylenol for his pain. In fact, Plaintiff specifically alleges that when he told Dr. Rasheed about this, Dr. Rasheed noted Plaintiff suffered no damage as a result. Though Plaintiff states he was still tender and sore, which Plaintiff felt he should not still be, Dr. Rasheed explained that Plaintiff had just had major surgery, a statement with which Plaintiff ultimately agreed. Moreover, Plaintiff's opinion that he should not be in pain, is, once again, his mere conclusion, rather than having any factual support.

When Plaintiff requested a second opinion after the second surgery, Plaintiff vaguely alleges that Dr. Powers and/or CSH sent him back to Dr. Rasheed. These allegations provide no basis to find that it was grossly negligent for Plaintiff to be sent back to the surgeon for complaints immediately following surgery and, once again, will not impose liability on Dr. Powers. Plaintiff has no constitutional right to a second medical opinion.

Finally, though Plaintiff alleges damages based on Dr. Rasheed's surgeries, he fails to provide any basis to find that Dr. Rasheed, an eye specialist who performed Plaintiff's surgeries at an outside facility, was acting under color of state law. *Nurre*, 580 F.3d at 1092; *Long*, 442 F.3d at 1185; *Jones*, 297 F.3d at 934. This does not preclude Plaintiff from proceeding against Dr. Rasheed for medical malpractice or gross negligence under California law, but it prohibits a claim against Dr. Rasheed under § 1983. Claim I is thus not cognizable against Dr. Powers or Dr.

10

Rasheed.

### 2. California Tort Claims Act

Plaintiff's claims against Dr. Rasheed are more akin to a gross negligence or medical malpractice claim under California law than to a violation of his federal rights. Under the California Tort Claims Act set forth in California Government Code sections 810 et seq., a plaintiff may not bring a suit for monetary damages against a public employee or entity unless the plaintiff first presented the claim to the California Victim Compensation and Government Claims Board, and the Board acted on the claim, or the time for doing so expired. "The Tort Claims Act requires that any civil complaint for money or damages first be presented to and rejected by the pertinent public entity." *Munoz v. California*, 33 Cal.App.4th 1767, 1776 (1995). The purpose of this requirement is "to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation." *City of San Jose v. Superior Court*, 12 Cal.3d 447, 455 (1974) (citations omitted). Compliance with this "claim presentation requirement" constitutes an element of a cause of action for damages against a public entity or official. *State v. Superior Court (Bodde)*, 32 Cal.4th 1234, 1244 (2004). Thus, in the state courts, "failure to allege facts demonstrating or excusing compliance with the claim presentation requirement subjects a claim against a public entity to a demurrer for failure to state a cause of action." *Id.* at 1239 (fn.omitted).

To be timely, a claim must be presented to the VCGCB "not later than six months after the accrual of the cause of action." Cal. Govt.Code § 911.2. Thereafter, "any suit brought against a public entity" must be commenced no more than six months after the public entity rejects the claim. Cal. Gov. Code, § 945.6, subd. (a)(1).

Federal courts must require compliance with the CTCA for pendant state law claims that seek damages against state employees or entities. *Willis v. Reddin*, 418 F.2d 702, 704 (9th Cir.1969); *Mangold v. California Public Utilities Commission*, 67 F.3d 1470, 1477 (9th Cir.1995). State tort claims included in a federal action, filed pursuant to 42 U.S.C. § 1983, may proceed only if the claims were first presented to the state in compliance with the applicable requirements. *Karim-Panahi v. Los Angeles Police Department*, 839 F.2d 621, 627 (9th

Cir.1988); *Butler v. Los Angeles County*, 617 F.Supp.2d 994, 1001 (C.D.Cal.2008). Though Plaintiff's claims may be viable under California law, he fails to state any allegations to show compliance with the CTCA to be allowed to proceed.

### 3. Supplemental Jurisdiction

Further, pursuant to 28 U.S.C. § 1367(a), in any civil action in which the district court has original jurisdiction, the district court "shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III," except as provided in subsections (b) and (c). "[O]nce judicial power exists under § 1367(a), retention of supplemental jurisdiction over state law claims under 1367(c) is discretionary." *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997). "The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court has cautioned that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

If Plaintiff has complied with the CTCA, jurisdiction over claims under California law will only be extended by this Court if he is able to state and proceeds on cognizable federal claims. However, where Plaintiff's claims are solely based on violation of California law, the Court will not exercise supplemental jurisdiction.

### B. Claim II (Doc. 1, pp. 9-10)

In this claim, Plaintiff alleges that Jane Doe Litigation Coordinator and John Doe Social Worker attempted to interfere and keep Plaintiff from filing this action. Plaintiff alleges that he wanted a fellow patient, Mr. Kindred, to have power of attorney over Plaintiff's medical care and information. Plaintiff alleges John Doe prolonged the process by telling Plaintiff he lost the first one, when in actuality, John Doe had submitted it to the Unit Supervisor who then submitted it to the Program IV Director in May 2018. Thereafter, John Doe admitted to doing this and that it was returned. Mr. Kindred contacted the CA Office of Patients' Rights at DHS-C and Patient Advocate, Mr. Daniel Wagner, stated they had never seen one done before, but they would look

into it. In June 2018, John Doe told Plaintiff that Jane Doe stated there was no way they would accept a power of attorney from one patient for another patient as it would be a "Health Information Violation," and there was no standing to allow it. Mr Kindred again contacted Mr. Wagner who suggested Plaintiff just file an advance health care directive. Thereafter, Plaintiff dictated an advance health care directive naming Mr. Kindred as his agent. The CA Office of Patients' Rights was contacted who witnessed Plaintiff's signature, verified what Plaintiff wanted, and witnessed the form. The next day John Doe was working, Mr. Kindred asked if he would "addressagraph" it and make a copy for Plaintiff before putting it in Plaintiff's chart. Approximately 15-20 minutes later, John Doe came to their dorm room and informed Plaintiff and Mr. Kindred that he "messed up" and it needed to be redone because John Doe put Mr. Kindred's "addressagraph" on it instead of Plaintiff's. When Mr. Kindred commented that John Doe would do anything he could to keep this from happening, John Doe responded that he just got confused because he saw Mr. Kindred's name on it, but that he had spoken with his supervisor who told John Doe he could write it up again and then call the CA Office of Patients' Rights again. Mr. Kindred indicated that he would re-type the form, but asked for John Doe to call the CA Office of Patients' Rights. After two weeks, Mr. Kindred asked John Doe to call again, but he indicated that he already had and was told it might take awhile because they were backed up.

### 1. Standards for Access to Court Claims

Inmates have a fundamental constitutional right of access to the courts. *Lewis v. Casey*, 518 U.S. 343, 346 (1996). Claims for denial of access to the courts may arise from the frustration or hindrance of "a litigating opportunity yet to be gained" (forward-looking access claim) or from the loss of a meritorious suit that cannot now be tried (backward-looking claim). *Christopher v. Harbury,* 536 U.S. 403, 412-15 (2002).

"[T]he injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. Inmates do not enjoy a constitutionally protected right "to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id.* at 355. Rather, the type of legal claim protected is limited to direct

criminal appeals, habeas petitions, and civil rights actions such as those brought under section 1983 to vindicate basic constitutional rights. *Id.* at 354 (quotations and citations omitted). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* at 355 (emphasis in original).

Moreover, when a prisoner asserts that he was denied access to the courts and seeks a remedy for a lost opportunity to present a legal claim, he must show: (1) the loss of a non-frivolous or arguable underlying claim; (2) the official acts that frustrated the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit. *Phillips v. Hust*, 477 F.3d 1070, 1076 (9th Cir.2007) (citing *Christopher*, 536 U.S. at 413-414, overruled on other grounds*, Hust v. Phillips*, 555 U.S. 1150 (2009)). Claim II is not cognizable because Plaintiff fails to show any claim that he has been unable to litigate or has lost because of his inability to obtain a power of attorney or the delay in obtaining an advanced health care directive from the other patient, Mr. Kindred.

## **ORDER**

For the reasons set forth above, Plaintiff fails to state any cognizable claims. Plaintiff is granted leave to file an amended complaint to cure the deficiencies identified in this order **within 21 days**. If Plaintiff no longer desires to pursue this action, he may file a notice of voluntary dismissal. If Plaintiff needs an extension of time to comply with this order, he shall file a motion seeking an extension of time no later than **21 days** from the date of service of this order.

Plaintiff must demonstrate in any amended complaint how the conditions complained of have resulted in a deprivation of Plaintiff's constitutional rights. *See Ellis v. Cassidy*, 625 F.2d 227 (9th Cir. 1980). An amended complaint must allege in specific terms how each named defendant is involved. There can be no liability under section 1983 unless there is some affirmative link or connection between a defendant's actions and the claimed deprivation. *Rizzo v. Goode*, 423 U.S. 362 (1976); *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980); *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

An amended complaint should be brief. Fed. R. Civ. P. 8(a). Such a short and plain

statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Although accepted as true, the "[f]actual allegations must be [sufficient] to raise a right to relief above the speculative level. . ." *Twombly*, 550 U.S. 127, 555 (2007) (citations omitted).

Plaintiff is further advised that an amended complaint supercedes the original, *Lacey v. Maricopa County*, Nos. 09-15806, 09-15703, 2012 WL 3711591, at *1 n.1 (9th Cir. Aug. 29, 2012) (en banc), and must be "complete in itself without reference to the prior or superceded pleading." Local Rule 220.

The Court provides Plaintiff with opportunity to amend to cure the deficiencies identified by the Court in this order. *Noll v. Carlson*, 809 F.2d 1446, 1448-49 (9th Cir. 1987). Plaintiff may not change the nature of this suit by adding new, unrelated claims in an amended complaint. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (no "buckshot" complaints). Based on the foregoing, the Court **ORDERS**:

1. Plaintiff is granted leave to file a first amended complaint;
2. The Clerk's Office shall send Plaintiff a civil rights complaint form; and
3. **Within 21 days** from the date of service of this order, Plaintiff must file a first amended complaint curing the deficiencies identified by the Court in this order or a notice of voluntary dismissal.

**If Plaintiff fails to comply with this order, this action will be dismissed for failure to obey a court order and for failure to state a claim**.

IT IS SO ORDERED.

Dated: __March 25, 2019__     /s/ Jennifer L. Thurston
                                          UNITED STATES MAGISTRATE JUDGE